James Saul (OSB #152809)
Wild & Scenic Law Center
3519 NE 15th Ave., #207
Portland, OR 97212
Tel. (503) 342-2839
jamie@wildandsceniclaw.org

*Counsel for plaintiff; additional counsel
listed on signature page*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, | Case No. _____ |
| Plaintiff, | COMPLAINT |
| v. | Federal Clean Water Act (28 U.S.C. § 1331 and 33 U.S.C. § 1365(a)) |
| CITY OF CANNON BEACH, | |
| Defendant. | |

## INTRODUCTION

1.      This is a complaint for injunctive and declaratory relief and civil

penalties under the Federal Water Pollution Control Act, commonly known as the

Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA" or "Act"). Plaintiff Northwest

Environmental Defense Center ("NEDC") brings this suit under section 505(a)(1) of

the CWA, 33 U.S.C. § 1365(a)(1), against defendant City of Cannon Beach ("City") to

abate and remedy the City's ongoing violations of the Act—persistent discharges of fecal bacteria and untreated human sewage to nearby beaches and surface waters— that have contributed to the degradation of the nearshore waters of the Pacific Ocean and posed a threat to public health for well over a decade.

2.      The City owns and operates a sewage collection system that collects and conveys residential, commercial, and industrial wastes from residences and businesses within the City's jurisdiction to the City's municipal wastewater treatment plant ("WWTP") for treatment and eventual discharge to nearby surface waters. The City's sewer system is aging and in poor physical condition, and the City's past and ongoing failure to properly manage and repair it has caused significant leaking and discharges of untreated waste (including human fecal wastes) onto public beaches and into nearby surface waters, including the Pacific Ocean.

3.      The City also owns and operates a small municipal separate storm sewer system ("MS4"), a series of pipes, drains, and other conveyances intended to collect, channelize and convey stormwater runoff onto public beaches and into nearby surface waters, including the Pacific Ocean. Like the City's sewer system, the City's MS4 is aging and in poor physical condition, and NEDC believes that, due to the state of disrepair of both the sewer system and the MS4, residential and municipal wastes (including untreated human fecal wastes) often leak, drain, discharge, and intermingle from and between the two conveyance systems. As a result, untreated wastes which should be routed to the City's wastewater treatment

COMPLAINT – 2

plant are instead unlawfully conveyed via the MS4 and discharged by the City directly onto public beaches and into surface waters including the Pacific Ocean.

4.     The unlawful discharges of untreated wastes from the City's MS4 directly onto nearby beaches and into the nearshore waters of the Pacific Ocean contain high concentrations of *E. coli* and other bacteria that threaten public health. For decades, beaches near the City and the nearshore waters of the Pacific Ocean have experienced regular beach closures and public health warnings due to the bacteria pollution. The City's discharges contribute to those closures, pose a danger to human health and the environment, and have been known to cause sickness in members of the public and their pets.

5.     Indeed, since 2013 several different water quality sampling efforts have demonstrated significant bacterial pollution at Cannon Beach. Most recently, water quality sampling performed by NEDC has shown that human DNA is present in the polluted discharges from the City's MS4 system to the City's public beaches, often in significant quantities. The presence of human DNA indicates that the pollution discharged from the City's MS4 is not merely stormwater runoff, and that the bacteria discharged is not merely from wildlife, but instead contains untreated human fecal wastes that the Clean Water Act requires to be treated prior to discharge.

6.     The City's ongoing discharges of human fecal wastes and other pollutants via the MS4 system are unlawful under the Clean Water Act. As the owner and operator of the MS4, the City is responsible for discharges of pollutants

from the MS4 to nearby surface waters. And although the City holds a discharge permit under the National Pollutant Discharge Elimination System ("NPDES"), that permit only authorizes discharges of treated wastes from the City's WWTP; only authorizes discharges from the single outfall identified in that permit; and imposes terms and conditions on the discharges to protect water quality. The City does not hold an NPDES permit that authorizes pollution discharges from any other outfall or from any component of the City's MS4.

7.    The City's unlawful discharges described herein cause harm to NEDC and its members, and to members of the general public who recreate on the City's beaches. Further, these unlawful discharges are ongoing and will continue unabated unless and until the Court enjoins them or otherwise issues a remedy capable of bringing the City into compliance with the Act.

8.    NEDC seeks injunctive and declaratory relief under section 505(a) and (d) of the CWA, 33 U.S.C. §§ 1365(a) and (d), including an order requiring the City to take all steps necessary to promptly and permanently end its CWA violations. NEDC also seeks the imposition of civil penalties for each of the CWA violations for which the City is found liable, pursuant to section 309(d) of the CWA, 33 U.S.C. § 1319(d), as adjusted by 40 C.F.R. § 19.4. NEDC also seeks an award of costs and attorney fees pursuant to 33 U.S.C. § 1365(d), and any other remedy this Court deems just and proper.

COMPLAINT – 4

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 (federal question jurisdiction) and 33 U.S.C. § 1365(a) (Clean Water Act

jurisdiction). The City is in violation of an "effluent standard or limitation" as

defined by 33 U.S.C. § 1365(f). The requested relief is authorized by 33 U.S.C.

§§ 1319(d) and 1365(a).

10.     Venue is properly vested in this Court pursuant to 33 U.S.C.

§ 1365(c)(1) because the events giving rise to the claims alleged herein occurred in

Clatsop County, Oregon, which is located within this judicial district and division.

11.     As required by the CWA, 33 U.S.C. § 1365(b), by letter dated December

19, 2024, NEDC provided the City with notice of its intent to file this suit to abate

the violations alleged herein ("Notice Letter"). As required by 40 C.F.R.

§ 135.2(a)(1), NEDC sent copies of its Notice Letter to the Administrator of the U.S.

Environmental Protection Agency ("EPA"), the Regional Administrator for EPA

Region 10, and the Director of the Oregon Department of Environmental Quality

("DEQ") at the same time NEDC mailed the Notice Letter to the City. A copy of the

Notice Letter is attached to this Complaint as Exhibit 1.

12.     More than sixty days have passed since NEDC's notice of intent to sue

was given to the proper parties in the manner described in the preceding

paragraph. The violations complained of are continuing or reasonably likely to

recur. Neither EPA nor DEQ has commenced or is diligently prosecuting a civil or

criminal action to abate the violations alleged in this Complaint.

COMPLAINT – 5

## PARTIES

13.     Plaintiff Northwest Environmental Defense Center is a membership organization suing on behalf of itself and its members. NEDC is an independent non-profit corporation organized and existing under the laws of the State of Oregon. NEDC maintains its principal place of business in Multnomah County, Oregon. Since 1969, the staff, student volunteers, and members of NEDC have advocated for cleaner water and air and for the preservation of public lands and wildlife habitat across the Pacific Northwest. NEDC and its members are "citizens" as defined by 33 U.S.C. § 1365(g).

14.     NEDC's organizational interests include protecting public health and water quality for the benefit of its members and the general public. NEDC frequently engages in public education to increase awareness of water quality issues; administrative advocacy to improve implementation and enforcement of the Clean Water Act; and—when necessary—litigation against facilities that are discharging pollution without an NPDES permit or are violating the terms of their permit. This suit is germane to NEDC's organizational interests.

15.     Several of NEDC's members are residents of the City or otherwise regularly use and enjoy the waters near the City's discharge points, including the City's public beaches and the nearshore waters of the Pacific Ocean that directly receive the City's unlawful pollution discharges. These members have future plans to continue using such waters for recreational, aesthetic, spiritual, conservation, educational, and other purposes. These members enjoy swimming, surfing, fishing,

COMPLAINT – 6

boating, and wading in the waters of the Pacific Ocean that receive the City's polluted discharges, and enjoy walking and recreating on the public beaches that receive the City's polluted discharges.

16.     Several of NEDC's members have observed or are otherwise aware that the City's unlawful discharges contain human wastes, bacteria, and other pollutants of public health and environmental concern. As a result, their aesthetic and recreational enjoyment of the City's public beaches and the nearshore waters of the Pacific Ocean has been diminished.

17.     One or more of NEDC's members are local conservationists who have devoted considerable time, energy, and money to the protection of the Pacific Ocean near the City and to the protection of its public beaches. These NEDC members are concerned that the City's unlawful discharges of polluted wastes (including untreated human fecal wastes) threaten their own health, the health of others in their community, and wildlife and pets that use the beaches and the nearshore waters of the Pacific Ocean.

18.     NEDC's interests, and those of its members, are adversely impacted and injured by the City's illegal discharges of pollutants and by the City's violations of its NPDES permit for its WWTP. This Court can redress those CWA violations and reduce the adverse impacts and injuries to NEDC and its members. Indeed, unless the relief requested in this Complaint is granted, the City's CWA violations will continue unabated and will continue to injure NEDC and its members'

commercial, aesthetic, recreational, and other interests in the City's public beaches, the Pacific Ocean, other nearby surface waters, and the wildlife they support.

19.    Defendant City of Cannon Beach is a duly incorporated municipality that lies within Clatsop County, Oregon. It is governed by an elected Mayor and City Council. The City owns and has complete operational control over all components of its WWTP, its sewer collection system, and its MS4.

## LEGAL BACKGROUND

20.    Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)(1).

21.    Section 301(a) of the CWA prohibits "the discharge of any pollutant by any person" except as in compliance with the Act. 33 U.S.C. § 1311(a).

22.    The phrase "discharge of a pollutant" is defined by the Act to include "any addition of any pollutant to navigable waters from any point source[.]" *Id*. § 1362(12).

23.    The word "pollutant" is defined by the Act to include "solid waste," "sewage," "biological materials," and "municipal . . . waste," among other types of waste. *Id*. § 1362(6).

24.    The phrase "point source" includes "any discernible, confined and discrete conveyance" including a "vessel or other floating craft . . . from which pollutants are or may be discharged." *Id*. § 1362(14).

25.    "Navigable waters" are defined by the Act to mean the "waters of the United States," which include waters that are "used in interstate or foreign commerce" (i.e., are navigable in fact or are used for commercial activities), as well as the "territorial seas" which include that portion of the Pacific Ocean that extends from the ordinary low water mark along the coast seaward to a distance of three miles. *Id*. § 1362(7), (8); 33 C.F.R. § 328.3(a); 40 C.F.R. § 120.2(a).

26.    Point-source discharges of pollution may be authorized by an NPDES permit issued under section 402 of the CWA. 33 U.S.C. § 1342. Among other requirements, all NPDES permits must ensure compliance with any effluent limitations that are applicable to the discharge as well as the water quality standards in place for the receiving waters. *Id*. § 1342(a)(1).

27.    DEQ issued the City NPDES Permit No. 102237 to authorize discharges of pollutants from the City's wastewater treatment plant at 295 East 2nd Street, Cannon Beach, Oregon 97110 (hereinafter "the City's NPDES Permit"). The City's NPDES Permit covers its WWTP and associated sewage collection systems and infrastructure, and it authorizes the City to discharge treated wastewater to waters of the United States from a single discharge point, provided the City complies with the terms and conditions in the City's NPDES Permit.

28.    Many types of stormwater discharges are regulated under the CWA and are unlawful without an NPDES permit. EPA regulations define "stormwater" to mean "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 C.F.R. § 122.26(b)(13). DEQ similarly defines stormwater to mean "water from

COMPLAINT – 9

precipitation or snow melt that collects on or runs off outdoor surfaces such as buildings, roads, paved surfaces and unpaved land surfaces." Or. Admin. R. 340-044-0005(41). In other words, "stormwater" includes only channelized runoff from the land surface, and is distinct from other types of discharges such as polluted effluent or wastes infiltrating via groundwater or leaking from sources other than surface runoff.

29.     An MS4 is a "conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains" owned or operated by a municipality and used for collecting or conveying stormwater. 40 C.F.R. § 122.26(b)(8)(i)–(ii). An MS4 is distinct from a "combined sewer"—*i.e.*, a sewer system that collects and conveys both sewage and stormwater—and is not a part of a publicly owned treatment works. *Id.* § 122.26(b)(8)(iii)–(iv).

30.     A "small MS4" is an MS4 that is not otherwise defined by EPA as a "large" or "medium" MS4—that is, it is one that serves a population of less than 100,000 people. 40 C.F.R. § 122.26(b)(16). Discharges from a small MS4 that are "composed entirely of storm water" are generally exempt from the requirement to obtain an NPDES permit. 40 C.F.R. § 122.26(a)(9)(i).

31.     There is no CWA exemption for municipal discharges that are not "composed entirely of storm water," even for small MS4s. In other words, if a municipal point-source discharge consists of something *other than* stormwater, or

contains stormwater mingled with non-stormwater wastes or pollutants, it is unlawful under CWA § 301(a) unless authorized by an NPDES permit.

32.    Because 33 U.S.C. § 1342(p)(1) creates an exemption for small MS4s from the otherwise broad prohibition on the discharge of pollutants found in § 1311(a), it "must be narrowly construed to achieve the purposes of the CWA." *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1001 (9th Cir. 2007). The party asserting that the exemption applies to its discharges bears the burden of proof. *Id.*; *see also Pac. Coast Fed'n of Fishermen's Associations v. Glaser*, 945 F.3d 1076, 1085 (9th Cir. 2019).

33.    Section 505 of the CWA authorizes citizens to bring a civil action against any person, including a municipality, who is alleged to be in violation of an effluent standard or limitation under the CWA. 33 U.S.C. § 1365(a). An effluent standard or limitation includes "an unlawful act under" section 301(a)—that is, the unpermitted discharge of pollutants to navigable waters—as well as a violation of any term or condition of an NPDES permit. *Id.* § 1365(f)(1), (7).

## GENERAL FACTUAL ALLEGATIONS

### A.    The City's wastewater treatment plant, sewer system, and MS4.

34.    The City's WWTP is located at 295 E. 2nd Street in Cannon Beach, Oregon. The WWTP was placed into operation in 2007, and it uses an activated sludge treatment system followed by ultraviolet disinfection to treat municipal waste prior to discharge. The treated effluent is discharged via a single outfall to a series of impounded wetlands and ultimately to Ecola Creek, which then flows

approximately one mile before entering the Pacific Ocean. Ecola Creek and the Pacific Ocean are waters of the United States.

35.    The City also owns and operates a sewage collection system that is designed to collect and transport raw sewage from residences and businesses to the City's WWTP. The City's sewage collection system consists of 367 manholes, approximately 88,000 linear feet of gravity sewer main, approximately 10,500 linear feet of pressure force main, and nine lift stations.

36.    The City's sewage collection system was constructed in 1958 and has deteriorated significantly over the past 75 years. Inflow and infiltration ("I&I")—the entry of groundwater and stormwater into the sewage collection system—has historically posed a significant problem for Cannon Beach.

37.    According to the City's February 19, 2021, *Wastewater Treatment Facilities Operation and Maintenance Manual Update*, a "continuing comprehensive maintenance program is essential to keep the City wastewater facilities functioning smoothly at minimum cost. It is the responsibility of City personnel to develop and execute this maintenance program." But DEQ has recognized that the City's "collection system and treatment plant exhibit high levels of [I&I]" and that the City "is aware of this condition." DEQ, Permit Evaluation Report for the City's NPDES Permit at 9 (Aug. 29, 2019) ("Permit Evaluation Report"). DEQ further recognized that collection systems with high I&I like the City's can experience "[o]verflows from the sanitary sewer system when it rains" or the "release of untreated or partially treated sewage" from the WWTP. *Id*.

38.     The City's December 2016 *Inflow and Infiltration Study* "uncovered 230 deficiencies" in the City's sewage collection systems, approximately 65% of which were identified along the mainline of the sanitary sewer system. That Study noted: "Leaking and other structural defects at service connections were also routinely observed." Appendix B to that report then documented dozens of locations where the sanitary sewer system was "leaking." The City's Annual I&I Reports show that the City does some work to address I&I problems within the City. But as explained below, water quality sampling results demonstrate that the City has not done enough to prevent harmful bacteria pollution at Cannon Beach.

39.     The City's NPDES Permit obligates the City to "at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) that are installed or used by the permittee to achieve compliance with the conditions of this permit." And the City's NPDES Permit for the WWTP remains in effect. By letter to the City dated April 9, 2024, DEQ stated: "Pursuant to Oregon Administrative Rule 340-045-0040(2), your current permit will remain in effect after its October 31, 2024 expiration date until DEQ acts on your renewal application."

40.     The City also owns and operates a small MS4 that collects stormwater runoff from locations throughout the City and conveys it, using a system of ditches, pipes, channels, and other conveyance structures, to several stormwater outfalls throughout the City. The City does not hold an NPDES permit authorizing discharges of pollutants from any portion of its MS4.

COMPLAINT – 13

41.    As relevant to this Complaint, the City's MS4 includes two outfalls that discharge polluted, bacteria-laden effluent mingled with stormwater directly onto public beaches and into the Pacific Ocean. One outfall, called the "Gower Street Outfall," is located at the southwestern end of Ecola Court in the City of Cannon Beach, near The Wayfarer Restaurant & Lounge and very close to a public beach access. Its coordinates are approximately Lat. 45.8893235816828, Long. -123.9637526960627.



The Gower Street outfall in Cannon Beach
(Photo: Oregon DEQ)

42.    The second location, called the "Tolovana Outfall," is located at the western edge of Tolovana Beach State Recreation Site, which is also a public beach access, just north of West Warren Way in the City of Cannon Beach. Its coordinates are approximately Lat. 45.87264428376422, Long. -123.96187900378513.

COMPLAINT – 14



The Tolovana outfall in Cannon Beach
(Photo: Oregon DEQ)

43.    Most or all of the stormwater discharged via the Gower Street and

Tolovana outfalls reaches the Pacific Ocean. At high tide, the ocean is just a few feet

from the outfalls.

**B.    The City's discharges via the Gower Street and Tolovana Outfalls contain high levels of bacteria and untreated human waste and pose a significant health risk to the public.**

44.    Polluted, bacteria-laden discharges from the Gower Street and

Tolovana outfalls have for more than a decade caused frequent beach closures

during the summer months, putting public health at risk. Both outfalls discharge

directly onto public beaches and into the nearshore waters of the Pacific Ocean,

COMPLAINT – 15

where members of NEDC and the public enjoy swimming, surfing, paddling, and other forms of recreation.

45.     Both Ecola Creek and the nearshore ocean waters of Cannon Beach are listed as "impaired" for bacteria on Oregon's list of impaired waters under section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), meaning they do not meet the state's water quality standards for bacteria that are intended to protect the public health from the risk of illness.

46.     The presence of certain strains of bacteria, in particular Escherichia coli (*E. coli*) and *Enterococci*, has long been used by EPA and other regulatory agencies to indicate the likely presence of untreated human waste in effluent or bodies of fresh water. *See, e.g.*, EPA, Ambient Water Quality Criteria for Bacteria 6 (1986) (explaining the strong correlation between *E. coli* presence and "swimming-associated gastroenteritis in freshwater" and that "the ultimate source of the agent is human fecal wastes"); EPA, What are fecal bacteria and why are they important? *at* https://archive.epa.gov/water/archive/web/html/vms511.html ("*E. coli* is a species of fecal coliform bacteria that is specific to fecal material from humans and other warm-blooded animals. EPA recommends *E. coli* as the best indicator of health risk from water contact in recreational waters[.]").

47.     DEQ has known about bacterial contamination at Cannon Beach and Tolovana Beach for over a decade. In a report dated May 2013 and entitled *Beach Monitoring Investigative Sampling at Cannon and Tolovana Beaches* ("the 2013 Sampling Report"), DEQ found that 2.5% of marine water samples and 14% of

freshwater samples collected within or near the City of Cannon Beach contained levels of *E. coli* and *Enterococcus* that exceeded recreational water quality criteria. The 2013 Sampling Report notes that bacterial contamination at Cannon Beach has been a known problem since 2003. The 2013 Sampling Report recognizes adverse impacts to public health from bacterial contamination, and identifies wastewater discharges and stormwater outfalls as potential sources of bacterial contamination at Cannon Beach.

48.    The Surfrider Foundation has documented bacteria pollution at Cannon Beach since at least 2021. Volunteers working with the Surfrider Foundation frequently collect water samples at public recreation locations along the Oregon coast known to be at risk of elevated bacteria, including at the Gower Street and Tolovana outfalls. Surfrider's water samples are analyzed for *Enterococcus*. As shown in the table below, on numerous occasions over the past five years the effluent discharged from the Gower Street and Tolovana outfalls has contained *Enterococcus* in concentrations of 100 MPN / 100 mL or more, which is indicative of likely contamination with untreated human waste:

**Table 1: Surfrider Foundation Water Quality Sampling Results**

| Gower Street Outfall: *Enterococcus* > 100 MPN / 100mL | | Tolovana Outfall: *Enterococcus* > 100 MPN / 100mL | |
|---|---|---|---|
| **Collection Date** | **Enterococcus (mpn/100mL)** | **Collection Date** | **Enterococcus (mpn/100mL)** |
| 10/22/24 | 359 | 9/11/24 | 813 |
| 6/5/24 | 374 | 6/5/24 | 568 |
| 9/15/23 | 145 | 10/11/23 | 309 |
| 7/17/23 | 379 | 9/15/23 | 175 |
| 7/10/23 | 2187 | 7/27/23 | 158 |

| 10/7/22 | 135 | 7/17/23 | 1355 |
| 9/29/22 | 1081 | | |
| 11/8/21 | 437 | | |
| 9/15/21 | 443 | | |
| 5/25/21 | 246 | | |

49.     More recently, microbial source tracking ("MST") using advanced laboratory techniques such as quantitative polymerase chain reaction ("qPCR") has been reliably used to determine whether materials tested are from human or other animal sources. qPCR allows a laboratory to identify and quantify the DNA fragments in the sample being tested. EPA has found that the qPCR method is a reliable "indicator of human fecal pollution[.]" EPA, Method 1697: Characterization of Human Fecal Pollution in Water by HumM2 TaqMan Quantitative Polymerase Chain Reaction (qPCR) Assay 1 (March 2019); *see also* EPA, Microbial Source Tracking Guide Document 35 (June 2005) (qPCR techniques can be used to "identify fecal contamination as human or nonhuman.").

50.     In September of 2024, DEQ published a report called the *Cannon Beach Microbial Source Tracking Study* ("2024 MST Study"). The purpose of that study was to better understand the potential sources of fecal bacteria contamination at Cannon Beach and Tolovana Beach.

51.     As part of the 2024 MST Study, DEQ collected water samples from ten different sites in and near Cannon Beach—including from both the Gower Street and Tolovana outfalls—over ten sampling events between June and November of 2022. DEQ analyzed all samples for bacteria and concluded that 7% of marine water samples and 25% of freshwater samples collected in the City exceeded water quality

COMPLAINT – 18

criteria for *E. coli* and *Enterococcus*. Those samples that exceeded state water quality criteria for bacteria were also analyzed using the qPCR technique to determine whether genetic markers for human, dog, or ruminants were present in those samples.

52.    In the 2024 MST Study, DEQ found that Chisana Creek—a small drainage that discharges via the Tolovana Outfall—had the highest number of human markers detected and had human markers detected more frequently than ruminant markers. Human markers were also detected at the Gower Street Outfall.

53.    DEQ concluded in the 2024 MST Study that it "did not expect the detection of human markers at six of the 10 sites because there are no apparent sources directly contributing human fecal bacteria in the study area." DEQ further stated that the "presence of human markers in the samples is of concern because fecal bacteria from human sources carry a higher risk of illness than fecal bacteria from dog or ruminant sources. The frequency of human marker detection may warrant further investigation to identify pollution sources."

54.    NEDC collected its own water samples from the Gower Street and Tolovana outfalls on several dates in 2024 and sent those samples to a laboratory to identify and quantify both the *E. coli* bacteria in each sample and the number of human gene copies in each sample using qPCR analysis. Table 2, below, shows the results of the samples analyzed by NEDC:

**Table 2: NEDC Water Quality Sampling Results**

| Sample Location | Collection Date | Laboratory Report Date | Avg. # of *E. coli* gene copies detected per 100/ml | Avg. # of human gene copies detected per 100mL |
|---|---|---|---|---|
| Gower Street outfall | 9/17/24 | 10/03/24 | 18 | 123 |
| | 9/25/24 | 10/11/24 | 7,261 | 15,191 |
| | 10/21/24 | 11/06/24 | 1,710 | 1,703 |
| | 11/25/24 | 12/12/24 | 1,895 | 152,278 |
| Tolovana outfall | 9/17/24 | 10/03/24 | 38 | 249 |
| | 9/25/24 | 10/11/24 | 2,480 | 2,218 |
| | 10/21/24 | 11/16/24 | 608 | 1,559 |
| | 11/25/24 | 12/12/24 | 1,810 | 1,936 |

55.    The presence of such high concentrations of both *E. coli* bacteria gene copies and human gene copies in the water samples collected by NEDC at the Gower Street and Tolovana outfalls indicates that untreated human fecal waste is a regular and significant component of those discharges, and thus that the discharges are not "composed entirely of stormwater" for CWA regulatory purposes.

56.    Stormwater by definition consists only of "surface runoff and drainage," 40 C.F.R. § 122.26(b)(13), and may contain pollutants from the ground surface. Municipal stormwater runoff generally, and in Cannon Beach specifically, does not and cannot plausibly contain the very high concentrations of *E. coli* and human fecal waste detected in the discharges from the Gower Street and Tolovana outfalls because there are no significant quantities of human fecal waste discarded on the surface of the ground in the watersheds that contribute runoff to the Gower Street and Tolovana outfalls.

57.    The City has for years publicly blamed wildlife and waste from illicit camping as possible sources of the bacteria pollution to its MS4 system and the

nearby public beaches. But recent DEQ and NEDC sampling data show the bacteria is primarily from human sources. Moreover, the City has never identified any evidence that campers or unhoused people are dumping human wastes into the City's MS4, or discarding human waste on the land surface where it can be collected by stormwater runoff, or generating waste in amounts that could plausibly result in bacteria and DNA sampling results as high as have been detected at the Gower Street and Tolovana outfalls. And even if there was such evidence, the City is responsible for preventing such discharges to its MS4.

58.     The City is liable for discharges of bacteria and human waste from the Gower Street and Tolovana outfalls because those discharges are not "composed entirely of stormwater" within the meaning of the CWA. The City owns and operates the City's sewage collection systems and MS4 and so is legally responsible for the discharge of pollutants from both systems.

59.     To date, the City has not conducted a study or investigation to conclusively identify, quantify, or eliminate the source or sources of untreated human fecal waste reaching its stormwater conveyance system. Although neither the City nor NEDC know *precisely* how human waste or bacteria pollution is entering the City's MS4, NEDC alleges the City is directly or indirectly contributing those pollutants to the City's MS4 because the City owns and operates the sewage collection systems and the MS4 in the City and the City's MS4 is discharging bacteria associated with human waste to the Pacific Ocean. NEDC's allegations that the City's sanitary sewer system is directly or indirectly contributing untreated

human waste or bacteria pollution to the MS4 and the Pacific Ocean will likely have

evidentiary support after a reasonable opportunity for further investigation and

discovery. Even if there are other sources of human waste and bacteria to the City's

MS4, the City's sewage collection system is a contributing factor to the pollution

problem at issue in this Complaint.

**C.    The City regularly violates the terms and conditions of the NPDES Permit for its WWTP and is in ongoing violation of the CWA.**

60.    In a Notice of Civil Penalty Assessment and Order directed to the City

and dated February 24, 2021, DEQ stated "The [City's NPDES] Permit does not

authorize overflows and discharges of raw sewage from the [WWTP] facility to the

storm drain, to the beach, or to the Pacific Ocean through the Nelchena Street

outfall." In fact, the City's NPDES Permit does not authorize discharges of raw

sewage from *any* part of the City's WWTP or sewage collection systems to *any* storm

drain, *any* beach, or *any* surface water including the Pacific Ocean.

61.    The "Permitted Activities" section of the City's NPDES Permit states:

Until this permit expires or is modified or revoked, the permittee is
authorized to: 1) operate a wastewater collection, treatment, control and
disposal system; and 2) discharge treated wastewater to waters of the
state only from the authorized discharge point or points in Schedule A
in conformance with the requirements, limits, and conditions set forth
in this permit.

Unless specifically authorized by this permit, by another NPDES or
Water Pollution Control Facility permit, or by Oregon statute or
administrative rule, any other direct or indirect discharge of pollutants
to waters of the state is prohibited.

62.    The City has violated, and continues to violate, this prohibition in the

Permitted Activities section of the City's NPDES Permit by regularly discharging

COMPLAINT – 22

pollutants, directly or indirectly, to waters of the state and the United States in ways and at locations that are not "specifically authorized by" the Permit. Such discharges include, but are not limited to, the discharges of *E. coli*, *Enterococcus*, and untreated human waste from the Gower Street and Tolovana outfalls described above.

63.    Schedule F, Condition A3 of the City's NPDES Permit states:

<u>Duty to Mitigate.</u> The permittee must take all reasonable steps to minimize or prevent any discharge or sludge use or disposal in violation of this permit. In addition, upon request of DEQ, the permittee must correct any adverse impact on the environment or human health resulting from noncompliance with this permit, including such accelerated or additional monitoring as necessary to determine the nature and impact of the noncomplying discharge.

64.    The City has violated, and continues to violate, Schedule F, Condition A3 of the City's NPDES Permit by failing to "take all reasonable steps to minimize or prevent" the recurring discharges of bacteria, including *E. coli*, and untreated human waste from the Gower Street and Tolovana outfalls. Available "reasonable steps" that Cannon Beach could have taken to "minimize or prevent" these pollutant discharges include, but are not limited to, implementing:

a.    A robust program for the detection and elimination of illicit discharges of pollutants, including bacteria and untreated human waste, into and from the City's MS4 system;

b.    A robust program for locating and replacing aging, degraded, and leaking sewer pipes and other components of the City's sanitary sewer system, which are likely leaking significant quantities of untreated

COMPLAINT – 23

human waste which is then collected and eventually discharged by the City's unpermitted MS4; and

c. A robust program for reducing inflow and infiltration ("I&I") into the City's MS4 system.

65.    Schedule F, Condition B1 of the City's NPDES Permit states:

<u>Proper Operation and Maintenance.</u> The permittee must at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) that are installed or used by the permittee to achieve compliance with the conditions of this permit. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of back-up or auxiliary facilities or similar systems that are installed by a permittee only when the operation is necessary to achieve compliance with the conditions of the permit.

66.    The City's sewage collection system is subject to Schedule F, Condition B1 of the City's NPDES Permit because it a part of the City's "facilities and systems of treatment and control (and related appurtenances) that are installed or used . . . to achieve compliance with the conditions of this permit."

67.    The City has violated, and continues to violate, Schedule F, Condition B1 of the City's NPDES Permit by failing to properly operate and maintain the City's sanitary sewer systems. Proper operation and maintenance within the meaning of that permit condition includes, at a minimum:

COMPLAINT – 24

    a.  Taking reasonable steps to ensure that illicit discharges from the sanitary sewer system into the MS4 system are discovered and eliminated;

    b.  Identifying, and replacing or repairing, aging or failing components of the City's sanitary sewer system, including any component that leaks; and

    c.  Undertaking the investigations necessary to discover whether and how bacteria and untreated human waste are entering the City's MS4 system from the sewage collection systems and developing a plan to reduce those pollution sources and discharges to protect water quality and public health.

68.    Schedule F, Condition B6 of the City's Permit states in part:

<u>Overflows from Wastewater Conveyance Systems and Associated Pump Stations</u>
a.  Definition. "Overflow" means any spill, release or diversion of sewage, including:
    (1) An overflow that results in a discharge to waters of the United States; and
    (2) An overflow of wastewater, including a wastewater backup into a building (other than a backup caused solely by a blockage or other malfunction in a privately owned sewer or building lateral), even if that overflow does not reach waters of the United States.
b.  Reporting required. All overflows must be reported orally to DEQ within 24 hours from the time the permittee becomes aware of the overflow. Reporting procedures are described in more detail in General Condition D5.

69.    Schedule F, Condition D5 of the City's Permit states:

<u>Twenty-Four Hour Reporting</u>
The permittee must report any noncompliance that may endanger health or the environment. Any information must be provided orally

COMPLAINT – 25

(by telephone) to the DEQ regional office or Oregon Emergency Response System (1-800-452-0311) as specified below within 24 hours from the time the permittee becomes aware of the circumstances.

a. Overflows.

    (1) Oral Reporting within 24 hours.

        i. For overflows other than basement backups, the following information must be reported to the Oregon Emergency Response System (OERS) at 1-800-452-0311. For basement backups, this information should be reported directly to the DEQ regional office.

            *(a)* The location of the overflow;

            *(b)* The receiving water (if there is one);

            *(c)* An estimate of the volume of the overflow;

            *(d)* A description of the sewer system component from which the release occurred (for example, manhole, constructed overflow pipe, crack in pipe); and

            *(e)* The estimated date and time when the overflow began and stopped or will be stopped.

        ii. The following information must be reported to the DEQ regional office within 24 hours, or during normal business hours, whichever is earlier:

            *(a)* The OERS incident number (if applicable); and

            *(b)* A brief description of the event.

    (2) Written reporting postmarked within 5 days.

        i. The following information must be provided in writing to the DEQ regional office within 5 days of the time the permittee becomes aware of the overflow:

            *(a)* The OERS incident number (if applicable);

            *(b)* The cause or suspected cause of the overflow;

            *(c)* Steps taken or planned to reduce, eliminate, and prevent reoccurrence of the overflow and a schedule of major milestones for those steps;

            *(d)* Steps taken or planned to mitigate the impact(s) of the overflow and a schedule of major milestones for those steps; and

            *(e)* For storm-related overflows, the rainfall intensity (inches/hour) and duration of the storm associated with the overflow.

DEQ may waive the written report on a case-by-case basis if the oral report has been received within 24 hours.

    70.    Schedule F, Condition B7 of the Permit states:

COMPLAINT – 26

<u>Public Notification of Effluent Violation or Overflow</u>
If effluent limitations specified in this permit are exceeded or an
overflow occurs that threatens public health, the permittee must take
such steps as are necessary to alert the public, health agencies and
other affected entities (for example, public water systems) about the
extent and nature of the discharge in accordance with the notification
procedures developed under General Condition B8. Such steps may
include, but are not limited to, posting of the river at access points and
other places, news releases, and paid announcements on radio and
television.

71.     Schedule F, Condition B8 of the Permit states:

<u>Emergency Response and Public Notification Plan</u>
The permittee must develop and implement an emergency response
and public notification plan that identifies measures to protect public
health from overflows, bypasses, or upsets that may endanger public
health. At a minimum the plan must include mechanisms to:
a.  Ensure that the permittee is aware (to the greatest extent possible)
    of such events;
b.  Ensure notification of appropriate personnel and ensure that they
    are immediately dispatched for investigation and response;
c.  Ensure immediate notification to the public, health agencies, and
    other affected public entities (including public water systems). The
    overflow response plan must identify the public health and other
    officials who will receive immediate notification;
d.  Ensure that appropriate personnel are aware of and follow the plan
    and are appropriately trained;
e.  Provide emergency operations; and
f.  Ensure that DEQ is notified of the public notification steps taken.

72.     Leaking from the sanitary sewer system is an "overflow" under the

City's NPDES Permit. Accordingly, the City has violated, and continues to violate,

Schedule F, Conditions B6.b., D5, B7, B8.b., B8.c., and B8.f. of the City's NPDES

Permit by failing to notify the required people and entities each time an "overflow"

occurred in the City, including each and every time the City leaked, spilled,

released, or diverted sewage from the sewage collection system or discharged

COMPLAINT – 27

sewage or bacteria pollution from the sewage collection or treatment systems to waters of the United States.

73.    Each of the discharges identified in Table 1 and Table 2 in the Notice Letter, in addition to any other leak, spill, release, diversion, or discharge to waters of the United States from the City's sewage collection and treatment systems or the Gower Street or Tolovana outfalls, is an "overflow" within the meaning of Schedule F, Conditions B6, D5, B7, and B8 because the spills or effluent contain pollutants including untreated or partially treated wastewater or sewage, as indicated by the presence of *E. coli* bacteria and human DNA, among other characteristics.

74.    The City has violated, and continues to violate, Schedule F, Condition D5 of the City's NPDES Permit by failing to report Permit noncompliance that may endanger health or the environment, including by failing to report the overflows to DEQ, failing to alert the public, health agencies and other affected entities about the overflows, and failing to fully implement an emergency response and public notification plan for each of the discharges described and alleged in Table 1 and Table 2 herein.

75.    The City has violated, and continues to violate, Schedule F, Condition D5 of the City's NPDES Permit by failing to comply with all the detailed reporting requirements set forth in that Permit condition each time the City was required to report under that Condition.

76.    The City has violated, and continues to violate, Schedule F, Condition B8 of the City's NPDES Permit by failing to fully implement an emergency response

COMPLAINT – 28

and public notification plan that fully complies with that Permit condition,
including by: failing to ensure the City is aware to the greatest extent possible of all
overflow events; failing to ensure appropriate personnel are immediately dispatched
for investigation and response each time there is an overflow event; failing to
ensure appropriate personnel follow the plan each time there is an overflow event;
failing to provide emergency operations each time there is an overflow event; and
failing to ensure DEQ is notified of the public notification steps taken each time
there is an overflow event.

77.    All violations of the City's NPDES Permit alleged herein occurred on
the dates identified in Tables 1 and 2, above, when water samples were collected at
the Gower Street and Tolovana outfalls. In addition, all Permit violations alleged
herein have occurred each and every day since at least January 1, 2020 because
throughout that period the City has maintained deficient wastewater collection and
treatment systems and programs for preventing unpermitted discharges of bacteria
and untreated human fecal waste. All Permit violations alleged herein constitute
violations of an "effluent standard or limitation" as that term is defined in the Clean
Water Act.

78.    All Permit violations alleged herein are also ongoing and reasonably
likely to recur. All Permit violations alleged herein (that is, the City's violations of
the General Prohibition at page 1; its violations of Schedule F, Condition A3; its
violations of Schedule F, Condition B1; and its violations of Schedule F, Conditions
B6, D5, B7, and B8) are ongoing and reasonably likely to continue unless and until

COMPLAINT – 29

they are abated by court order, in part because the City will continue operating its WWTP and related facilities after NEDC files this complaint, but it has no imminent plans to properly operate and maintain its sanitary sewer system or to take any other action to remedy the ongoing Permit violations alleged herein.

79.    Defendants' unlawful activities and NPDES permit violations degrade the environment and nearby surface waters, including beaches and nearshore areas in and near the City of Cannon Beach, and including waters and shorelines important to and used by NEDC's members.

80.    The City's unlawful activities and NPDES permit violations were avoidable had the City been diligent in overseeing and controlling operations, maintenance, monitoring, and compliance with the law.

81.    The City has benefitted economically from its unlawful activities and NPDES permit violations.

82.    Any and all additional violations of the CWA or the City's NPDES Permit by the City that occur or are discovered after those described in the Notice Letter but before a final decision in this action are continuing violations subject to this Complaint.

83.    Without the imposition of appropriate civil penalties and the issuance of an injunction and other relief, the City is likely to continue to violate the CWA to the further injury of NEDC, its members, and others.

## CLAIMS FOR RELIEF

### First Claim for Relief:
### Discharges of pollutants to waters of the United States without a permit in violation of CWA section 301(a), 33 U.S.C. § 1311(a)

84. NEDC incorporates and re-alleges each of the preceding paragraphs and the allegations in the Notice Letter, attached hereto as <u>Exhibit 1,</u> as if fully stated herein.

85. The City's Gower Street and Tolovana outfalls are "point sources" within the meaning of the CWA.

86. The City's discharges from the Gower Street and Tolovana outfalls contain bacteria and untreated human fecal waste, both of which are "pollutants" within the meaning of the CWA.

87. The City's discharges from the Gower Street and Tolovana outfalls reach the nearshore waters of the Pacific Ocean, which is a "water of the United States" within the meaning of the CWA.

88. Because they contain bacteria and untreated human fecal waste in significant concentrations or quantities that is derived from sources other than surface runoff to the MS4, the discharges from the Gower Street and the Tolovana outfalls are not "composed entirely of stormwater" and are thus not exempt from NPDES permitting requirements under section 402(p) of the CWA, 33 U.S.C. § 1342(p).

89. The City does not hold an NPDES permit that authorizes pollutant discharges from either the Gower Street or the Tolovana outfalls.

90.    The City has discharged pollutants, including bacteria and untreated human waste, from the Gower Street and Tolovana outfalls on each occasion upon which Surfrider Foundation, DEQ, or NEDC collected a sample from those outfalls.

91.    In addition, the City has discharged pollutants, including bacteria and untreated human waste, from the Gower Street and Tolovana outfalls on each and every day since at least January 1, 2020.

92.    The City has not taken action to reduce or eliminate its pollutant discharges from either the Gower Street or the Tolovana outfalls. Those discharges are ongoing and, unless abated by an order of the Court, will continue indefinitely.

93.    Each occasion upon which the City discharges pollutants from either the Gower Street or the Tolovana outfalls is a violation of the CWA's prohibition on "the discharge of any pollutant by any person" except as in compliance with the Act. 33 U.S.C. § 1311(a).

94.    Each occasion upon which the City discharges pollutants from either the Gower Street or the Tolovana outfalls is a violation of an "effluent standard or limitation" under the CWA's citizen suit provision. 33 U.S.C. § 1365(a)(1), (f)(7).

95.    The City's unlawful and unpermitted discharges warrant the imposition of declaratory and injunctive relief and the assessment of civil penalties in the amount of up to $68,445 per day of violation. 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4.

COMPLAINT – 32

**Second Claim for Relief:**
**Violations of the City's NPDES Permit**

96.     NEDC incorporates and re-alleges each of the preceding paragraphs and the allegations in the Notice Letter, attached hereto as <u>Exhibit 1,</u> as if fully stated herein.

97.     The City has violated, and continues to violate, the City's NPDES Permit as described and alleged herein. These violations occurred on each of the dates set forth in Table 1 and Table 2 above, and on each and every other day since at least January 1, 2020.

98.     The City's violations of the City's NPDES Permit described herein and in the Notice Letter constitute violations of an "effluent standard or limitation" as defined by section 505(f) of the CWA, 33 U.S.C. § 1365(f).

99.     The City's violations of the City's NPDES Permit are continuing or are reasonably likely to recur in part because the City will continue operating its WWTP and deficient sewage collection facilities after NEDC files this Complaint.

100.    The City's unlawful discharges and NPDES Permit violations warrant the imposition of declaratory and injunctive relief and the assessment of civil penalties in the amount of up to $68,445 per day of violation.

**REQUEST FOR RELIEF**

WHEREFORE, plaintiff NEDC respectfully requests that this Court grant the following relief:

   A.  Declare that the City has violated and continues to be in violation of the City's NPDES Permit and the Clean Water Act, as alleged herein.

   B.  Assess civil penalties against the City in the amount of $68,445 per violation per day;

   C.  Permanently enjoin the City from discharging pollutants into the Pacific Ocean from the Gower Street or Tolovana outfalls unless and until it obtains an NPDES permit authorizing such discharges;

   D.  Permanently enjoin the City from operating the WWTP, MS4, and related infrastructure in a manner that results in violations of the City's NPDES Permit or the Clean Water Act;

   E.  Issue injunctive relief requiring the City to abate and remediate the environmental damage and ongoing impacts of its unlawful and unpermitted discharges from the Gower Street and Tolovana outfalls;

   F.  Award plaintiffs their costs of litigation, including reasonable attorney and expert witness fees, pursuant to 33 U.S.C. § 1365(d); and

   G.  Grant such other relief as the Court deems just and proper.

COMPLAINT – 34

Respectfully submitted this 10th day of March, 2025.


s/ James N. Saul

James Saul (OSB #152809)
Wild & Scenic Law Center
3519 NE 15th Ave., #207
Portland, OR 97212
Tel. (503) 342-2839
jamie@wildandsceniclaw.org


s/ Mary M. Stites

Mary Stites (OSB #225005)
Northwest Environmental Defense Center
10101 S. Terwilliger Blvd.
Portland, OR 97217
Tel. (503) 768-6747
mary@nedc.org